**Robert L. WANG, Plaintiff and Appellee,**

v.

**Victor J. WANG and Albert Schramm, Defendants and Appellants.**

16058.

Supreme Court of South Dakota.

Submitted on Briefs Nov. 30, 1988.

Decided May 3, 1989.

Rehearing Denied June 9, 1989.

---

Bryce A. Flint of Jackley & Flint, Sturgis, for plaintiff and appellee.

Donald E. Covey of Covey Law Office, Winner, for defendant and appellant Schramm.

MORGAN, Justice.

Albert Schramm (Schramm), who co-signed a promissory note with Victor Wang (Victor) in favor of the Rosebud Credit Union, appeals from a judgment entered on a jury verdict in favor of Robert Wang (Robert), assignee of the note, in Robert's suit to recover a deficiency judgment. We reverse and remand.

This appeal comes before this court after reversal of an earlier decision in Schramm's favor and the retrial thereof. The initial decision and background information may be found at *Wang v. Wang*, 393 N.W.2d 771 (S.D.1986) (Wang I). The substance of the decision was that Schramm was not a signer in a representative capacity and thus could be held liable to the assignee.

In July 1980, when Robert received the promissory note and security agreement by assignment from the Rosebud Credit Union, he promptly notified Victor and took exclusive possession of the collateral that secured the note, which was stored on his property in Meade County. He told Victor that he was to stay away from the collateral. Robert maintained control over the collateral by keeping it on his private property, draining radiators, and protecting it from vandals.

In September 1981, while retaining exclusive possession of the collateral, Robert commenced the lawsuit on the note, which culminated in *Wang I*. In December 1984, after the first trial and while the appeal therefrom was in process, Robert undertook the sale of the collateral. A notice of sale was published in the *Mellette County News*, White River, South Dakota, the county where the vehicles were titled but not where the collateral was located. No other notices were published. No sale bills were prepared or distributed. No notice was sent to Schramm. The notice of sale stated that the property would be sold on January 18, 1985, "at 1915 Junction, Sturgis, South Dakota. The sale shall be held in Sturgis as the property is not in working condition and also too bulky to be transported." The address given was Robert's residence and the notice did not state whether the property was available for inspection.

The sale was conducted at Robert's kitchen table on the day and time set. Only Robert and his attorney were present. The collateral was not present at the place where the sale was to be conducted and was in fact located approximately five miles away. Robert, who conducted the sale, bid $100 for the property.

After the foreclosure sale, Robert brought suit to recover a deficiency judgment, the genesis of this appeal. The jury returned a verdict in favor of Robert in the amount of $42,900.00. On appeal, Schramm raises several claims of alleged error. Among others, he contends that the trial court erred by denying his motions for directed verdict and judgment notwithstanding the verdict (n.o.v.) on the grounds that:

(1) Robert had failed to give Schramm notice of the dispositional sale of the collateral;

(2) The sale of the collateral was not a commercially reasonable sale; and

(3) Robert had elected a remedy of strict foreclosure thereby barring a deficiency judgment.

We agree with Schramm that Robert is barred from recovering a deficiency judgment under issue three.

We first determine that, as to the issues under review, there is no dispute as to the facts. Thus, the appeal hinges entirely on the application of the law to those facts. The applicable law is found entirely within the Uniform Commercial Code (U.C.C.) and more particularly in SDCL ch. 57A–9, Secured Transactions. To simplify matters, further references to the Code will be made by referring to its corresponding U.C.C. citation, 9–504(3) for example.

We first choose to review the issue of failure to give Schramm notice of the public sale. There is no question that Robert did not send any notice of sale to Schramm. It is Robert's position that he was not required to do so because, while both Victor and Schramm were debtors on the note, only Victor was a debtor with regard to the collateral. In support of this position, he cites us to 9–105(1)(d) which provides, in pertinent part: "Where the debtor and the owner of the collateral are not the same person, the term 'debtor' means the owner of the collateral in any provision of the chapter dealing with the collateral[.]'" He cites us to no case authority after the enactment of the U.C.C., in support of his position.

■ 9–504(3) requires that, absent certain conditions not relevant here, "reasonable notification of the time and place of any public sale ... shall be sent by the secured party to the debtor if he has not signed after default a statement renouncing or modifying his right to notification of sale." A debtor is defined at 9–105(1)(d) as:

'Debtor' means the person who owes payment or other performance of the obligation secured, whether or not he owns

or has rights in the collateral, and includes the seller or accounts or chattel paper. Where the debtor and the owner of the collateral are not the same person, the term 'debtor' means the owner of the collateral in any provision of the chapter dealing with the collateral, the obligor in any provision dealing with the obligation, and may include both where the context so requires[.]

The majority of jurisdictions interpreting this provision have held that "guarantors, accommodation parties, and other obligors who owe a collateral duty to pay deficiencies are debtors within the meaning of Article 9 of the Code." *Ford Motor Credit Co. v. Lototsky*, 549 F.Supp. 996, 1002 (E.D.Pa. 1982).

We agree with the majority view. In *Wang I, supra*, we determined that Schramm was personally liable to Robert as a comaker of the note but made no determination as to his accommodation character. In view of the fact that Robert earnestly seeks to hold Schramm liable for any deficiency, we deem the exact nature of his liability to be unimportant, for he would nevertheless be included among the class of "other obligors who owe a collateral duty to pay deficiencies."

■ We then consider what is the effect of Robert's failure to give Schramm the requisite notice. Schramm urges that it amounts to a bar against any deficiency, but this is an issue that this court has yet to decide. The provision governing failure to comply with the U.C.C. notice requirements is found at 9–507(1) wherein it states, in pertinent part: "If the disposition has occurred the debtor ... has a right to recover from the secured party any loss caused by the failure to comply with the provisions of this part." There are three divergent views on the effect of this provision on deficiencies.

One view is that since it does not mention deficiencies, they are not precluded. Some courts have held that 9–507(1) prescribes the sole penalty for the creditor's failure to give notice and does not shield the debtor from a deficiency judgment.

See *Lincoln Rochester Trust Co. v. Howard,* 75 Misc.2d 181, 347 N.Y.S.2d 306 (N.Y. City Ct.1973); *Commercial Credit Corp. v. Wollgast,* 11 Wash.App. 117, 521 P.2d 1191 (1974).

The other extreme, the anti-deficiency view, decries recovery of a deficiency where the notice requirement was not met for the reason that it would permit a continuation of the evil which the U.C.C. sought to correct. This view stresses the loss of the owner's right of redemption through his loss of the opportunity to bid at the sale. *Skeels v. Universal C.I.T. Credit Corp.,* 222 F.Supp. 696 (W.D.Pa. 1963) *(vacated on other grounds,* 335 F.2d 846 (3rd Cir.1964)). Another line of anti-deficiency cases holds that strict compliance with the notice requirement is a condition precedent to a claim for a deficiency. *Bank of Gering v. Glover,* 192 Neb. 575, 223 N.W.2d 56 (1974).

Lastly, there is an intermediate view, termed the Arkansas Rule, holding that 9–507(1) is not an exclusive remedy, but that SDCL 57A–1–103 incorporates prior principles of law and equity which remain effective. This rule indulges a rebuttable presumption that the collateral was worth at least the amount of the debt, thereby shifting to the creditor the burden of proving the amount that would reasonably have been obtained through a sale conducted according to law. *Norton v. National Bank of Commerce of Pine Bluff,* 240 Ark. 143, 398 S.W.2d 538 (1966).

Our decision in *First Nat. Bank of Minneapolis v. Kehn Ranch,* 394 N.W.2d 709 (S.D.1986), discussed the effect of failure to give notice of the sale of the collateral cattle at sale barns.[1] First, the majority noted that Kehns had waived their right to receive prior notice of sale of collateral, because notice became an issue at trial and the jury found by special interrogatory that bank had failed to give reasonable notice. Next, the majority responded that 9–504(3) authorizes sale without notice of collateral of a type customarily sold on a recognized

market, and that auction sale barns are a recognized market, thereby eliminating the requirement for notice. Obviously, *Kehn Ranch* is not authority for this case inasmuch as the collateral was not cattle, nor was it sold on a public market that would be recognized, even under the *Kehn Ranch* definition. It is, however, illustrative of a situation where the deficiency was not and could not have been created by the manner of sale. As noted in the dissent, "it is strikingly obvious that the large deficiency was created by the disappearance of approximately two-thirds of the collateral prior to Bank's repossession and not due to the sale of the remaining collateral." 394 N.W.2d at 724. Similarly, in this case, undisputed testimony in the record would place the 1980 value of the collateral at the time it was seized by Robert in the amount of at least $30,100.

It is obvious that Robert improperly sought to gain for himself a huge windfall by his method of handling this sale. For that reason, it would be easy to say that the harshest of remedies should be applied against him and adopt the anti-deficiency view expressed above. Or we could adopt the other extreme and hold Robert, or any other creditor, free of the requirement that reasonable notice be given where appropriate under the code requirements. However, it is said that bad facts often create bad law and we prefer to step back and take a wider view of the result of our decision. In doing so, we choose to adopt the so-called Arkansas Rule and raise a rebuttable presumption that the value is equal to the amount of the debt.

In this case, as previously noted, the undisputed testimony of Victor, the owner of the collateral, placed the value of the property at the time it was seized. Granted that there was a considerable period that elapsed between the seizure and the sale. Under the facts in this case, any further depreciation should not redond to the benefit of Robert and to the loss of Schramm or Victor. Even so, it appears

---

1. For a discussion on the distinction between notice and commercially reasonable sale, *see* Richard Barnes, Field Warehousing Cattle and Their Sale on Recognized Markets, 9 J.Agric. Tax'n & L. 337–352 (1988).

that there does exist a deficiency between the amount of principal and interest sought on the note and the value of the collateral seized.

Schramm next urges that Robert is denied a deficiency judgment because the sale of the collateral was not "commercially reasonable." 9–504(3) requires: "Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable." We discussed the criteria for a commercially reasonable sale in *First Bank v. Haberer Dairy & Farm Equipment*, 412 N.W.2d 866 (S.D.1987), wherein we adopted the following checklist identifying distinguishing characteristics of an acceptable auction sale:

1. A sale at which the public, particularly including the knowledgeable trade public, is invited, by prior advertisement, to appear and bid for the collateral to be sold.

2. If the collateral is goods, they should be available for inspection by prospective bidders before the sale.

3. The advertisement should be published in at least one newspaper of general circulation, and perhaps appropriate trade publications, reasonably in advance of the time of sale to allow potential bidders to participate, and should provide a reasonable amount of information concerning the time and place of sale and the collateral to be sold.

4. The goods must be offered and sold for cash to the highest responsible bidder; and bidders must know of other bids and be permitted to raise their bids.

5. The place of sale, moreover, must be accessible to the general public; and the sale itself, if not conducted by one of the parties or a public official, must generally be under the direction of a licensed auctioneer.

*Id.* at 871–2 (citing W. Davenport & D. Murray, *Secured Transactions*, § 6.05(b)(2), at 273–74). In *Haberer Dairy* we determined that the sales proceeds were commercially reasonable, so we did not discuss the remedy that would be available were they not so.

Just as in the preceding issue on notice, the U.C.C. provision for remedy for failure to sell in a commercially reasonable manner is likewise found in 9–507(1), which provides in pertinent part:

If it is established that the secured party is not proceeding in accordance with the provisions of this part disposition may be ordered or restrained on appropriate terms and conditions. If the disposition has occurred the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to the disposition has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this part.

And, just as in the case of failure to give notice, courts seem to follow the middle of the road reasoning of the Arkansas Rule.

The failure to sell collateral in a commercially reasonable manner does not necessarily preclude the creditor from recovering a deficiency.

'[N]oncompliance with the statute gives rise to a presumption in favor of the debtor that the collateral was worth the amount of the outstanding debt at the time of the default and the debtor is freed from any deficiency unless the creditor proves that the fair market value of the collateral was no greater than the sales price[.] ... [W]hen the creditor seeks a deficiency but has failed to sell the goods in a commercially reasonable manner, the debtor is entitled to be credited with the fair market value of the collateral rather than the actual sales price.'

*Ferrous Financial Services Co. v. Wagnon*, 70 Or.App. 285, 291, 689 P.2d 974, 978 (1984) (citing *All–State Leasing v. Ochs*, 42 Or.App. 319, 600 P.2d 899 (1979)).

In this case, the jury was instructed in the language of 9–504(3) and the *Haberer Dairy* checklist. They were further instructed that if they found that the sale

was not commercially reasonable, then they must find "that the obligation of Albert Schramm to pay the amount of the promissory note is discharged to the extent the sale proceeds were inadequate." Neither party raises any issue on appeal with regard to the propriety of the instructions. We do not find them objectionable under the theory of recovery espoused by the Oregon courts, which we deem to be appropriate for application in this state.

■ In both this issue and the preceding one, we find it difficult to review the propriety of the verdict because only a general verdict form was submitted to the jury. There were no interrogatories submitted with respect to Schramm's defenses of lack of notice, commercially unreasonable sale, and strict foreclosure. With respect to the first two, as we have discussed them, we are left with a dilemma. We must assume that the jury followed the court's instructions. Therefore, they either found that the statutory requirements were complied with or they applied the court's instruction and set off any loss to Schramm that they found to be due because of the violations, thereby reducing the claim for $80,000 plus to the figure of $42,900.

It is admitted that no notice of sale was given to Schramm. The sale procedures followed by Robert were pathetically short of complying with the *Haberer Dairy* checklist. Further, the bid was so far below the value of the property, that we can say as a matter of law that those provisions were violated. However, that does not mean that the jury verdict cannot stand. We have said that, "in a civil case, if a general verdict is handed down and the jury could have decided the case on two theories, one proper and one improper, the reviewing court will assume that it was decided on the proper theory." *Mid–America Marketing Corp. v. Dakota, Etc.*, 289 N.W.2d 797, 799 (S.D.1980). Because the jury could have reached the verdict under the instruction and allowed for the inadequacies of the sale procedures, we must uphold it.

■ Lastly, we examine Schramm's argument that Robert, by his actions, had constructively elected the remedy of strict foreclosure and is thereby barred from recovering a deficiency judgment. 9–505(2) provides for strict foreclosure, in pertinent part:

> [A] secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor[.] ... In the absence of ... written objection the secured party may retain the collateral in satisfaction of the debtor's obligation.

Clearly, "a creditor's election of strict foreclosure prevents obtainment of a deficiency judgment." *Haberer Dairy*, 412 N.W.2d at 869. Because Robert denies that he elected strict foreclosure, and there clearly was no written notice of election, the question then becomes whether Robert, by his actions, made a de facto election. We find that he did.

Robert relies heavily on *Haberer Dairy*, wherein we held that the creditor (Bank) did not elect strict foreclosure to the exclusion of all other remedies. Instead, Bank availed itself of other remedies; namely, it sued on the debt and attempted to sell the collateral. Further, Bank notified debtors that it did *not* accept the collateral in full satisfaction of the debt. *Id.* at 870.

Even though the trial court ruled that Bank was entitled to possession of the collateral, and Haberers executed a bill of sale transferring the collateral, Bank did not take possession until some eight months later. This delay was permitted by Bank to allow Haberer time to satisfy the judgment or obtain refinancing. An auction sale was conducted approximately six months after Bank took possession of the collateral and receipts were properly applied in satisfaction of Bank's judgment against the debtor. *Id.* at 868–69.

We find this case to be factually distinguishable from *Haberer Dairy* for the following reasons:

> (1) Robert took and maintained exclusive control and possession of the collateral from time he purchased the note in July 1980;

(2) Robert continuously held the collateral on his property and told Victor not to remove it and to stay away;

(3) It was not until over a year later, in August 1981, that Robert filed suit to collect on the promissory note; and

(4) Robert did not undertake the sale of the collateral until December 1984, some four and one half years after taking possession.

Although Robert did not give written notice of his intention to exercise strict foreclosure, we deem that under the facts of this case Robert's actions operated as a de facto election of strict foreclosure. He is thereby barred from obtaining a deficiency judgment.

We reverse the judgment and remand with instructions to enter judgment in favor of Schramm.

All the Justices concur.